# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 23, 2015          Decided July 10, 2015

No. 14-7021

JANE LEGGETT AND K.E., A MINOR, BY HER PARENT AND NEXT
FRIEND, JANE LEGGETT,
APPELLANTS

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00084)

———

*Jane A. Leggett*, pro se, argued the cause and filed the briefs
for appellants.

*Carl J. Schifferle*, Assistant Attorney General, Office of the
Attorney General for the District of Columbia, argued the cause
for appellee. With him on the brief were *Irvin B. Nathan*, Attorney
General at the time the brief was filed, *Todd S. Kim*, Solicitor
General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: TATEL and PILLARD, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case presents a recurring issue under the Individuals with Disabilities Education Act: When a parent chooses, without school officials' consent, to send her child to a private school, under what circumstances must the school district reimburse the parent for the costs of attending that school? Here, the parent chose a private boarding school, and both a hearing officer and the district court denied reimbursement because, in their view, the child had no need to be in a residential program. On the record before us, however, all statutory, regulatory, and judicial requirements for reimbursement of the costs of private school have been satisfied: the school district failed to offer the child a "free appropriate public education" in either a public school or a non-residential private school, 20 U.S.C. § 1412(10)(C)(i); the private boarding school the parent selected was, at the time, the only one on the record "reasonably calculated to enable the child to receive educational benefits" designed to meet the child's needs, *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 207 (1982); the residential component of the private school was in fact "necessary to provide a free appropriate public education to" the child, 34 C.F.R. § 104.33(a)(c)(3); and the school district has not shown that the parent acted "unreasonabl[y]," 20 U.S.C. § 1412(10)(C)(iii)(III). Accordingly, we reverse and remand for further proceedings consistent with this opinion.

**I.**

Under the Individuals with Disabilities Education Act (IDEA), every child with a disability in this country is entitled to a "free appropriate public education," or FAPE. 20 U.S.C. § 1400(d)(1)(A). As Congress explained when it passed IDEA, the Act's primary purpose is "to ensure that all children with

disabilities have available to them a[n] . . . education that emphasizes special education and related services designed to . . . prepare them for further education, employment, and independent living." *Id.* "Special education," in turn, means, simply, instruction "specially designed . . . to meet the unique needs of a child with a disability." *Id.* § 1401(29).

To guarantee that no child with a disability misses out on the education the Act promises, and to ensure, in turn, that the education offered is "appropriate," IDEA requires that school officials develop a comprehensive strategy, known as an "individualized education program," or IEP, tailored to the student's unique needs. *Id.* § 1414(d)(1)(A). Critical to the issue before us, IDEA requires that school districts have an IEP in place for each student with a disability "[a]t the beginning of each school year." *Id.* § 1414(d)(2)(A).

Although Congress envisioned that children with disabilities would normally be educated in "the regular public schools or in private schools chosen jointly by school officials and parents," *Florence County School District Four v. Carter By and Through Carter*, 510 U.S. 7, 12 (1993), it provided that parents who believe that their child's public school system failed to offer a free appropriate public education—either because the child's IEP was inadequate or because school officials never even developed one—may choose to enroll the child in a private school that serves her educational needs. *Id.* Specifically, IDEA provides that if parents "enroll the child in a private . . . school without the consent of [the school district], a court or a hearing officer may require the [school district] to reimburse [them] for the cost of that enrollment . . . ." 20 U.S.C. § 1412(10)(C)(ii). The statute requires reimbursement, however, only where the school district has failed to "ma[k]e a free appropriate public education available to the child." *Id.* Reimbursement, moreover, may be "reduced or denied" if the parents fail to notify school officials of their intent to withdraw the child, *id.* § 1412(10)(C)(iii)(I), deny them a chance to evaluate the

student, *id.* § 1412(10)(C)(iii)(II), or, of special relevance here, otherwise act "unreasonabl[y]," *id.* § 1412(10)(C)(iii)(III).

In regulations that largely track these provisions, the Department of Education has made clear that parents can obtain reimbursement even for residential programs. Specifically, the regulations state that "[i]f a public or private residential placement is necessary to provide a free appropriate public education to a handicapped [child] because of his or her handicap, the placement, including non-medical care and room and board, shall be provided at no cost to the [child] or his or her parents or guardian." 34 C.F.R. § 104.33(c)(3).

Elucidating these provisions, the Supreme Court explained in *School Committee of Town of Burlington v. Department of Education of Massachusetts* that it is the Act's grant of equitable authority that empowers a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement . . . is proper under the Act." 471 U.S. 359, 369 (1985). In such cases, "parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement." *Id.* at 370. For parents who make the latter choice, the Court reasoned, "it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials." *Id.* Because such a result would be contrary to IDEA's guarantee of a "free appropriate public education," the Court confirmed that "Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case." *Id.*

A decade later, and again considering the conditions under which reimbursement for a parental placement is appropriate, the Court reiterated in *Florence County School District Four v. Carter* that IDEA empowers courts to order school officials to

reimburse parents for their expenditures on private special education if the private placement was "'proper under the Act.'" 510 U.S. at 12 (quoting *Burlington*, 471 U.S. at 369). In setting out that requirement, the Court acknowledged that "Congress has imposed a significant financial burden on states and school districts that participate in IDEA." *Id.* at 17. But school districts, the Court observed, have complete control over their fate: "public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do [so by] . . . giv[ing] the child a free appropriate public education in a public setting, or plac[ing] the child in an appropriate private setting of the State's choice." *Id.* This, according to the Court, "is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims." *Id.*

In this case, we must determine the precise contours of these requirements: Under what circumstances does the school district's failure to offer an IEP by the start of the year—either in a public or private school—amount to a denial of FAPE? When is a private boarding-school placement "proper under the Act"? And what factors must a court consider when addressing the equities? But given that these issues arise in the context of the education of a particular child—Appellant Jane Leggett's teenage daughter K.E.—we turn first to the facts.

Now nineteen years old, K.E. attended school in the District of Columbia Public Schools, or DCPS, from kindergarten through the end of her first attempt at the eleventh grade in 2012. While in elementary school, K.E. was diagnosed with several learning issues, including "deficits in auditory awareness and in fine motor skills." Hearing Officer Determination at 4. Although her elementary school provided her with special education, her middle school did not. Still, when K.E. entered Wilson High School in 2009, Leggett asked school officials to evaluate her daughter for learning disabilities. The school agreed to perform that evaluation,

but it had failed to do so by the fall of 2011 when K.E. began her junior year.

By October of that year, although K.E. had been identified as a student of above-average intelligence, she was failing most of her classes, often due to inattention, disorganization, and anxiety. Dispirited by her personal and academic struggles, K.E. threatened suicide that same fall. In February 2012, spurred on by K.E.'s efforts to harm herself and the news that she would probably fail to graduate if things did not change, Leggett again asked school officials to evaluate her daughter. When the school district refused—instead recommending that Leggett pay for a private assessment—Leggett filed a due-process complaint seeking a comprehensive evaluation to determine K.E.'s eligibility for special education. *See* 20 U.S.C. § 1415(f) (providing for an "impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency"). When school officials finally agreed to undertake the necessary testing, Leggett withdrew her complaint.

The resulting evaluations demonstrated that although K.E.'s verbal skills were in the "superior" range, her non-verbal cognitive abilities were "low-average" and she demonstrated weakness in executive functions, including organization, planning, and processing speed. Even more worrisome, DCPS's own psychologist concluded that K.E.'s anxiety and depression were "disabling" to her "life functions," Hearing Officer Determination at 8, and K.E.'s private doctor diagnosed her with Major Depressive Disorder, Panic Disorder, Post-Traumatic Stress Disorder, an Identity Problem, a Reading Disorder, and Attention-Deficit Hyperactivity Disorder. To combat those conditions, the private psychologist recommended that K.E. be placed in a "small, highly structured therapeutic classroom with a low student to teacher ratio throughout her day" and proposed a "more intensive educational program" for K.E., including benchmarking of reading fluency, strategies to support reading comprehension, and evidence-based cognitive behavioral strategies for depression and

anxiety. Neuropsychological Evaluation at 6–7; Due Process Hearing, Testimony of Dr. Culotta at 138.

Given these recommendations, Wilson officials convened a team in the weeks following final exams to develop an IEP for K.E. for the next school year. *See* 20 U.S.C. § 1414(b)(4)(A) ("[T]he determination of whether the child is a child with a disability as defined in [the Act] and the educational needs of the child shall be made by a team of qualified professionals and the parent of the child . . . ."). Following two June meetings, however, the team had yet to complete the IEP, so it agreed to meet again in late August to finalize the plan. The team also recommended that, in the meantime, K.E. receive counseling over the summer. On June 21, just a week after the IEP team had met, Leggett emailed Wilson's Special Education Coordinator to pin down the details of the August meeting and to ask for guidance on the recommended summer counseling. She received no response. Facing a summer without the recommended assistance, Leggett next left a voicemail message for the Coordinator. No response. Finally, Leggett sent a letter in early July to the same effect. Again, nothing.

Having received no indication that DCPS would finalize K.E.'s IEP before the school year began, and thus with no assurance that K.E. would get the special-education services she needed, Leggett began exploring alternative placements. She investigated "literally dozens" of possible schools, but she found only two that appeared to meet K.E.'s needs. One, a local private day school, rejected K.E. on the ground that a "highly structured, supportive school or therapeutic setting" would better serve her needs. The other, the Grier School—a boarding school in Pennsylvania—accepted her for the upcoming term.

On August 6, just three weeks before the Wilson school year would begin, Leggett sent DCPS written notice, as the Act requires, *see* 20 U.S.C. § 1412(10)(C)(iii)(I)(bb), that she would be withdrawing K.E. from Wilson and seeking public funding for her placement at the Grier School. Critical for our purposes,

Leggett's communication made clear that she "remain[ed] open to" the possibility that K.E. could return to Wilson if the school offered her a satisfactory IEP. Letter from Benjamin W. Massarsky to Peter Cahall, Principal, Woodrow Wilson High School, Aug. 6, 2012. Again, no response. Having heard nothing by August 17, just 10 days before the first day of the Wilson school year, Leggett filed a new due-process complaint seeking either an acceptable IEP at Wilson or reimbursement for the cost of attending Grier.

Five days before the first day of school, Leggett finally heard from DCPS when school officials contacted her to schedule a "resolution meeting." The record does not indicate what happened at that meeting, and although the parties agreed at oral argument that the meeting occurred on August 29, neither could offer any details. Everyone agrees, however, that the session resulted in no IEP. On September 4, without an IEP in place and with no guarantee that K.E. would receive the special education she required if she returned to Wilson, Leggett enrolled her at Grier.

By all accounts, K.E. thrived there. The school offered her individualized tutoring, life-skills instruction, and extra study hall, all coordinated under the rubric of Grier's Learning Skills Program, and all consistent with her psychologists' recommendations. The proof is in the results: whereas K.E. had failed to complete the eleventh grade at Wilson, she pulled all A's and B's in her first semester at Grier.

Meanwhile, on September 11, more than two weeks into the Wilson school year, K.E.'s IEP team met once again to try to finalize her plan. By September 24, officials had come up with a document, but according to Leggett, the IEP was riddled with errors and failed to include many of the special-education programs K.E. needed. DCPS, by contrast, insists that the document was substantively valid, if sloppily done. Whichever version one credits, though, DCPS officials clearly had no IEP in

place for K.E. by the time the Wilson year began, or even by the time she had to enroll at Grier.

In late October, a Hearing Officer took up Leggett's request for reimbursement for the tuition and fees she had paid to Grier. Although the Officer found that DCPS had denied K.E. a free appropriate public education, he nonetheless concluded that the Grier placement was improper because K.E. had no need to be in a *residential* program. *See* Hearing Officer Determination at 16–20. Accordingly, he denied Leggett any reimbursement at all.

Pursuant to IDEA's judicial-review provision, 20 U.S.C. § 1415(i)(2)(A), Leggett filed two law suits against DCPS in the U.S. District Court for the District of Columbia, one seeking reimbursement for the 2012–13 school year and the other for 2013–14. In the matter before us now—the 2012–13 suit—the parties filed cross motions for summary judgment and, basing its decision entirely on the administrative record, the district court denied Leggett's request for reimbursement for much the same reason as the Hearing Officer had, adding only that in its estimation, Leggett had acted unreasonably by withdrawing K.E. from Wilson in August and sending her to an expensive boarding school. *See K.E. v. District of Columbia*, 19 F. Supp. 3d 140, 151–152 (D.D.C. 2014).

Leggett appeals. Although our review would typically be for "clear error as to any factual findings and abuse of discretion as to the remedy," *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 522 (D.C. Cir. 2005), where, as here, the district court "t[akes] no additional evidence" and instead "grant[s] summary judgment based simply on the administrative record . . . we review its decision de novo . . . and apply the same non-deferential standard the district court . . . applied to the hearing [officer's legal] decision." *Id.*

**II.**

As interpreted by the Supreme Court, IDEA requires school districts to reimburse parents for their private-school expenses if (1) school officials failed to offer the child a free appropriate public education in a public or private school; (2) the private-school placement chosen by the parents was otherwise "proper under the Act"; and (3) the equities weigh in favor of reimbursement—that is, the parents did not otherwise act "unreasonabl[y]." *See Carter*, 510 U.S. at 15–16; 20 U.S.C. § 1412(10)(C)(iii)(III). Leggett and DCPS disagree at every turn. Leggett argues that DCPS's failure to provide K.E. an IEP by the beginning of the 2012 school year itself constituted an IDEA violation, that the placement at Grier was proper, and that nothing in the record suggests that she acted unreasonably. In her view, therefore, the equities weigh in her favor and she is entitled to reimbursement. For its part, DCPS argues that any IDEA violation was procedural and thus not a denial of FAPE, that the Grier placement was improper because K.E. could have succeeded in a non-residential program, and that Leggett acted unreasonably in her dealings with Wilson administrators. Accordingly, it argues, Leggett is entitled to no reimbursement at all. We address each point in turn.

A.

Recall that the IEP is the vehicle through which school districts typically fulfill their statutory obligation to provide a free appropriate public education and that officials must have an IEP in place for each student with a disability "[a]t the beginning of each school year." 20 U.S.C. § 1414(d)(2)(A). DCPS concedes that it failed to satisfy that timeliness requirement with respect to K.E. The parties part ways, however, over the import of that uncontested fact. According to Leggett, DCPS's failure to offer K.E. an IEP by the first day of school was, by itself, a denial of FAPE, thus satisfying the first of IDEA's three requirements for private-school reimbursement. DCPS's own Hearing Officer

agreed: "I find . . . that DCPS'[s] failure to develop an IEP for [K.E.] before the start of the 2012–2013 school year . . . was a clear denial of FAPE." Hearing Officer Determination at 17. Disagreeing with that conclusion, DCPS argues that the IEP violation was procedural and *de minimis* and, therefore, not a denial of FAPE.

DCPS has the standard correct: a procedural violation, such as a school district's failure to provide an IEP by the beginning of the school year, will constitute a denial of a free appropriate public education only if it "result[s] in loss of educational opportunity" for the student. *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 834 (D.C. Cir. 2006) (internal quotation marks omitted). That is, a school district's failure to comply with the procedural requirements of IDEA will be "actionable" only "if those procedural violations affected the student's substantive rights." *Id.* at 832, 834 (emphasis omitted).

Applying that standard to the circumstances of this case, DCPS argues that Leggett has not "demonstrated" that its failure to offer K.E. an IEP by the beginning of the 2012 school year—a delay of somewhere between two weeks and a month, depending on whose facts one credits—amounted to "an educational deprivation or substantive violation." Appellee's Br. 23. To be sure, this court has at times required parents to "demonstrate . . . that [the student's] education was affected by any procedural violations [the school district] might have committed," *Lesesne*, 447 F.3d at 834. We have done so, however, only where the violation was not obviously substantive. *See, e.g.*, *id.* (plaintiff failed to demonstrate that the school district's failure to satisfy mid-year IEP deadline was a substantive violation). And in the particular circumstances of this case, we think the violation was quite clearly substantive. Although "[a] delay does not affect substantive rights if the student's education would not have been different had there been no delay," *D.R. ex rel. Robinson v. Government of District of Columbia*, 637 F. Supp. 2d 11, 18

(D.D.C. 2009), the converse is true as well: a delay does affect a student's substantive rights, and is therefore "actionable," *see Lesesne*, 447 F.3d at 832, if the student's education *would* have been different but for the procedural violation. That is the case here. DCPS concedes—and the Hearing Officer found—that K.E. needed an IEP that included special education and related services. *See* Hearing Officer Determination at 16 (noting that K.E. was "determined to be eligible for special education and related services" and describing "her IEP needs"); *see also* Appellee's Br. 5–7 ("The [IEP] team agreed at the May 2012 meeting that K.E. was eligible for special education services."). Put another way, DCPS acknowledges that K.E.'s education would have been different if school officials had fulfilled their statutory responsibilities on time: with an IEP in place at Wilson, K.E. would have received the targeted special education she needed; without an IEP and still at Wilson, she would have been on her own, much as she was for the first three years of high school, during which she struggled mightily. Under these circumstances, DCPS's failure to have an IEP in place by the start of the school year—in clear violation of its IDEA obligations—adversely affected K.E.'s educational opportunities and therefore denied her a FAPE. DCPS's arguments to the contrary are without merit.

First, although its logic is far from clear, DCPS seems to contend that Leggett is actually to blame for the violation because she "had already decided" to send K.E. to a private boarding school some three weeks before the start of the school year, while school officials were still doing their best to get an IEP in place. Appellee's Br. 23. According to DCPS, then, it was Leggett's fault that school officials ran out of time and so it was Leggett, not DCPS, who effectively caused K.E. to lose out on educational opportunities. That is, it was Leggett who transformed the absence of an IEP from a procedural deficiency into a substantive harm. In this sense, the school system argues, this case looks a lot like *C.H. v. Cape Henlopen School District*, 606 F.3d 59 (3d Cir. 2010). There, like here, the school district failed to complete an IEP for

the student before the start of the school year. And, like here, the child's mother elected to withdraw him from his public school, place him in a private school, and seek reimbursement. Denying reimbursement, the Third Circuit found that the delay was procedural, not substantive, because the parent had caused it. Although the school district missed the deadline, it had demonstrated a "consistent willingness to evaluate C.H. and to develop an IEP." *Id.* at 69. "[T]he [p]arents," however, "delayed the continuation of [the IEP] meeting until after the start of classes, and ultimately terminated the process by filing a due process request." *Id*. Under those circumstances, the court held, the school district's failure to adopt a final IEP before the first day of school did not violate the student's substantive rights.

By contrast, the record in this case contains no evidence that Leggett's decision to withdraw K.E. from Wilson prevented school officials from developing an IEP. Indeed, although Leggett notified Wilson on August 6 that K.E. would enroll at Grier to start the school year, she expressly left open the possibility that K.E. could instead begin the year in public school if officials were prepared to provide the special education that even the school system agreed she needed. *See* Massarsky Letter. What is more, even if Leggett had never made this offer and instead had summarily withdrawn K.E. from Wilson, nothing would have stopped DCPS from fulfilling its statutory obligation to complete an IEP by the beginning of the school year. This case thus looks nothing like *Cape Henlopen*. There the court pointed to evidence that the school district would likely have gotten an IEP together but for the parent's intransigence. Here Leggett had made K.E. available for evaluation, and she remained open to leaving her daughter at Wilson until she had to enroll at Grier. DCPS had until the beginning of the Wilson school year to create an IEP for K.E. It is entirely illogical for the school system to blame Leggett for its failure to do so.

14

DCPS next argues that Leggett's own communications with school officials show that those officials were acting in good faith. For instance, it points out that Leggett told the Special Education Coordinator that she had "sent a set of proposed [classroom] accommodations to the special education teacher and had talked more with the school social worker about goals for the behavioral section of the IEP." Appellee's Br. 8 (internal quotation marks omitted) (alteration in original). Of course, these communications merely highlight the fact that despite Leggett's repeated entreaties, no IEP materialized. But DCPS's argument gets even more preposterous. Seeking to demonstrate that Leggett should have known that school officials were on the road to an IEP, the school system observes that Leggett, "[f]ollowing up on [its] offer of counseling for K.E. during the summer, . . . suggested a specific therapeutic program in Connecticut, where K.E. would be spending most of the summer with her grandmother." *Id.* at 8–9. The implication seems to be that Leggett had to have known that K.E. would be taken care of because school officials were considering summer placements. But we fail to see how Leggett's communication regarding *her own* efforts to find a summer program for K.E. could possibly demonstrate the school district's good faith when school officials failed to respond to that very communication.

Moreover, nothing in IDEA required Leggett to wait until the first day of school to pull K.E. out of Wilson. In fact, the Act expressly prohibited her from waiting that long. IDEA requires a parent to notify the school district ten days before she sends her child to private school to remedy an IDEA violation. *See* 20 U.S.C. § 1412(10)(C)(iii)(I)(bb). On DCPS's reading, Leggett should have given school officials a chance to finish the IEP by the first day of school at Wilson before withdrawing K.E. But had Leggett waited that long she would have been entitled to no reimbursement because she would have violated the ten-day notice requirement. DCPS, therefore, asks us both to require parents to

notify school officials ten days out and to penalize Leggett for notifying them too early. DCPS cannot have it both ways.

In sum, then, Leggett's actions imposed no impediments to DCPS fulfilling its statutory responsibilities. Quite to the contrary, it was DCPS's failure to develop an IEP that forced Leggett's hand. School officials acknowledged in June 2012 that K.E. needed an IEP. Yet they responded to none of Leggett's communications, fulfilled none of their statutory responsibilities, and left her in a position in which the only way to find out if DCPS would ever develop an IEP would have been to leave K.E. at Wilson despite lacking any evidence that the school was close to having a plan ready. IDEA prohibits school districts from forcing parents to make that kind of decision.

For all of these reasons, we agree with the Hearing Officer and the district court that DCPS denied K.E. a free appropriate public education by failing to have an IEP in place by the beginning of the school year. The school system, of course, may still escape liability if the placement at Grier was otherwise improper under the Act or if Leggett acted unreasonably, questions to which we now turn.

## B.

The parties offer dueling tests for determining whether the Grier School placement was "'proper under the Act.'" *Carter*, 510 U.S. at 12 (quoting *Burlington*, 471 U.S. at 369). According to Leggett, the placement was proper because Grier offered K.E. the tools she needed to complete her education. As DCPS would have it, the critical factor is that Grier is a *residential* school—one with an equestrian program, it repeatedly emphasizes. Because K.E. could have succeeded in a non-residential school, DCPS argues, the placement was improper.

We begin with what is undisputed: under the Supreme Court's decision in *Rowley*, a public school district need not guarantee the best possible education or even a "potential-maximizing" one. 458

U.S. at 197 n.21. Instead, an IEP is generally "proper under the Act" if "reasonably calculated to enable the child to receive educational benefits." *Id.* at 207; *see also Branham v. District of Columbia*, 427 F.3d 7, 9 (D.C. Cir. 2005) (IEP need not maximize the child's development as long as it "provide[s] some [educational] benefit") (internal quotation marks omitted). True, as DCPS points out, the Supreme Court enunciated this principle, and this court has echoed it, in the context of disputes over whether the education *the school district* offered was proper. But we believe the standard applies as well where, as here, the parent makes the choice. Whether the school system or the parent chooses the private school, the *Rowley* standard protects the child by guaranteeing an education "reasonably calculated" to benefit her. As we explain below, moreover, where the parent selects the private school because the school system failed to provide a FAPE and the court finds that the school the parent selected is "reasonably calculated to enable the child to receive educational benefits," the court may still "reduce[] or den[y]" reimbursement if "[e]quitable considerations" warrant it—for instance, "if the cost of the private education was unreasonable." *Carter*, 510 U.S. at 16. In this way, and consistent with *Rowley*, we ensure not only that the child's IDEA rights are fully protected, but also that the school system will not be required to fund a program that exceeds what the child needs to obtain a "free appropriate public education."

Employing the *Rowley* standard where the parent chooses the school is also consistent with the practice of our sister circuits. In the decision the Supreme Court affirmed in *Carter*, for instance, the Fourth Circuit held that "when a public school system has defaulted on its obligations under the Act, a private school placement is 'proper under the Act' if the education provided by the private school is 'reasonably calculated to enable the child to receive educational benefits,'—the same standard by which the appropriateness of a public school's IEP is assessed." *Carter By and Through Carter v. Florence County School District Four*,

950 F.2d 156, 163 (4th Cir. 1991), aff'd, 510 U.S. 7 (1993) (quoting *Rowley*, 458 U.S. at 207) (citation omitted). The Second Circuit has concurred, holding that "the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement . . . . [T]he issue turns on whether a placement—public or private—is 'reasonably calculated to enable the child to receive educational benefits.'" *Frank G. v. Board of Education of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006) (quoting *Rowley*, 458 U.S. at 207).

The baseline, then, is this: a parent's unilateral private placement is proper under the Act so long as it is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. DCPS urges us to apply a more exacting standard because Grier is a boarding school. In particular, it asks us to require that the placement be not just reasonably calculated to provide educational benefits, but *necessary* to serve that goal. In support, it points to the above-mentioned regulation providing that a school system must pay for a residential placement only if "necessary to provide a free appropriate public education to a handicapped person." 34 C.F.R. § 104.33(c)(3). It also relies on *McKenzie v. Smith*, in which this court explained that a residential placement is unnecessary to the student's education if it is "'a response to medical, social or emotional problems that are segregable from the learning process.'" 771 F.2d 1527, 1534 (D.C. Cir. 1985) (quoting *Kruelle v. New Castle County School District*, 642 F.2d 687, 693 (3d Cir. 1981)); *see also Ashland School District v. Parents of Student R.J.*, 588 F.3d 1004, 1010 (9th Cir. 2009) (although teachers reported that student had difficulty turning in assignments on time, she earned good grades when she completed her work, was well regarded by teachers, and was not disruptive, and it was student's "risky behaviors" outside of school that prompted her parents to enroll her in facility). In other words, if a placement reasonably calculated to educate the child could be provided in a non-residential school or if a parent

sends her child to a residential program primarily to treat the child's emotional, social, or psychological issues, then the placement is not "necessary to provide a free appropriate public education." Contrary to DCPS's argument, however, neither of these principles bars reimbursement here.

To begin with, the record demonstrates that the Grier placement was primarily educational and not "a response to medical, social or emotional problems that are segregable from the learning process." True, K.E.'s educational difficulties can be traced to her social issues—as well as her anxiety and depression, which are, of course, "emotional problems," though not of the "explosive" and debilitating variety present in *McKenzie*, *see* 771 F.2d at 1533—but nothing in the record indicates that Leggett sent K.E. to Grier to receive medical care. Instead, K.E. went there to receive the help her IEP team and two psychologists identified as necessary to her education, including small classes, individualized tutoring, and life-skills instruction. Indeed, Grier, which the Hearing Officer found was "not a residential treatment center or a therapeutic boarding school," Hearing Officer Determination at 20, and which the district court agreed was "not primarily a school for kids with learning or emotional issues," *K.E. v. District of Columbia*, 19 F. Supp. 3d at 152, offered those precise benefits. *See, e.g.*, Due Process Hearing, Testimony of Learning Skills Teacher at 176–182; *see also Munir v. Pottsville Area School District*, 723 F.3d 423, 433 (3d Cir. 2013) ("the fact that classes are offered may provide evidence that the purpose of the placement is, in fact, educational"). The Hearing Officer found as much, concluding that "[K.E.] is doing well at [Grier]," "turning her school work in and showing improvement . . . ." Hearing Officer Decision at 13. The results confirm that conclusion: whereas K.E. had fallen behind at Wilson, she was an above-average student at Grier. *See id.* at 13. Because the placement was thus "primarily oriented toward enabling [K.E.] to obtain an education," *Dale M. ex rel. Alice M. v. Board of Education of Bradley-Bourbonnais High School District No. 307*, 237 F.3d 813, 817 (7th Cir. 2001),

it was, under the regulation, "necessary to provide a free appropriate public education" to her.

The Grier program was "necessary" in another significant—indeed, dispositive—way: it was the only placement on the record that could have provided K.E. with an education that met her identified needs. DCPS neither offered an IEP by the start of the year nor identified—before the hearing officer, in the district court, or here—an alternative placement of any kind. In fact, it failed even to challenge Leggett's assertion—repeated at every stage of the proceedings—that she considered more than a dozen schools, that only two were appropriate, and that one of those denied K.E. admission. Instead, DCPS has repeatedly insisted, against all logic, that the Wilson IEP itself offered the required "educational benefits," despite the fact that it did not exist in any form when the Wilson school year began—or even until a month into the school year, when K.E. was already firmly ensconced at Grier. To be sure, had DCPS offered K.E. a spot at a less expensive day school in the District—or just identified one early enough in the process—the Grier placement may not have been "necessary." Indeed, as explained above, to fulfill its obligations under the Act, DCPS had no obligation to offer K.E. a program as good as Grier's. *See Rowley*, 458 U.S. at 197 n.21 (education need not be "potential[]maximizing"). Under *Rowley*, the Act required it to offer a program "reasonably calculated to enable [K.E.] to receive educational benefits." *See id.* at 207. But because school officials offered her no such program, either in the public schools or a non-residential private school, the Grier placement was quite plainly "necessary" for K.E. to obtain the educational services she was entitled to under IDEA.

In this sense, Leggett's case resembles *McKenzie v. Smith* in a way that helps her. Although we noted the distinction between educational and medical placements in *McKenzie*, we ultimately concluded that DCPS would have to pay for the student's boarding school because there, as here, "DCPS . . . failed at every stage in

the proceedings to comply with . . . its obligations under [IDEA]." 771 F.2d at 1535. And there, as here, the placement was "the only program supported by any evidence in the record" that could plausibly offer educational benefit to the child. *Id.* Under these circumstances, we concluded, DCPS had no basis for faulting his parents for sending him to the private residential school they ultimately chose.

So too here. Because Grier was "necessary" to K.E.'s education and because it was "reasonably calculated to provide educational benefit," it was "proper under the Act." Under the statute and regulations, therefore, DCPS must reimburse Leggett for her costs. Although this conclusion applies most comfortably to Grier's tuition, it extends to room and board as well. The regulation expressly requires that "the placement, including . . . room and board, shall be provided at no cost to the [child] or his or her parents or guardian" if it is "necessary" to the child's education. 34 C.F.R. § 104.33(c)(3). Because K.E. could not possibly have attended Grier, some three hours from the District, without living there, the school's residential program was clearly "necessary" and thus reimbursable.

Before moving on, we must address one final issue. Although not saying so expressly, DCPS appears to argue that even if the Grier School program as a whole was proper under the Act, certain components were not. When parts of a placement are not primarily oriented toward education—that is, when those parts are not the kind of "special education and related services" the Act guarantees—"the school district is not obligated to bear the total cost of the placement." *King v. Pine Plains Central School District*, 918 F. Supp. 772, 778 (S.D.N.Y. 1996). Instead, it must cover the cost of the educational portion of the program "but need not fund . . . non-educational expenses." *Id.* Although we have concluded that Grier's educational and residential programs were "necessary" because DCPS had offered K.E. no alternative, the school system may, on remand, seek to demonstrate that specific

components of the placement, such as extracurricular activities or the horseback riding to which DCPS so vociferously objects, were not "primarily oriented toward" educating K.E., *Dale M.*, 237 F.3d at 817, and were therefore not "necessary" under the Act.

## C.

This, then, brings us to the final question, *i.e.*, the equities. Recall that IDEA allows a district court to "reduce[] or den[y]" reimbursement—even if the placement meets all of the Act's other requirements—based "upon a . . . finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(10)(C)(iii)(III); *see also Carter*, 510 U.S. at 16. Acting on that invitation, the district court found—and DCPS continues to argue—that Leggett behaved unreasonably in several ways: by "remov[ing] K.E. from Wilson three weeks before the start of the school year, at a time when the District had not yet failed in its obligations"; by placing K.E. at a school that "is not primarily a school for kids with learning and emotional issues"; by failing to challenge the IEP DCPS officials created for K.E. in September 2012; and by choosing a school "far from the District of Columbia" with "an annual cost of $[58,100]." *K.E. v. District of Columbia*, 19 F. Supp. 3d at 152. In our view, and given the record before us, none of these actions was unreasonable.

To begin with, we think it quite unremarkable that Leggett pursued a private placement for K.E. over the summer and then notified DCPS of the withdrawal in early August. As explained above, faced with school officials who were not responding to her phone calls or emails, who failed to provide the promised summer counseling, and who had yet to show any sign of producing an IEP in time for the school year, Leggett did what any parent would do: she began exploring other opportunities for her child. Even so, her lawyer's letter notifying officials of the Grier placement made clear that she "remain[ed] open" to keeping K.E. at Wilson and would "seriously consider" it if DCPS provided her with an IEP. *See* Massarsky Letter. But having failed to do so by the beginning

of school, DCPS left Leggett with no choice but to send her daughter to Grier, lest she risk the child spending another year at Wilson without an IEP. Nothing about the timing of Leggett's actions was unreasonable.

Defending the court's second reason, although DCPS argued earlier that the Grier placement was improper because it was primarily oriented toward K.E.'s "medical, social or emotional" needs, *see supra* 19, it now faults Leggett for sending K.E. to a school that was not restrictive *enough*. *See* Appellee's Br. 40 ("Grier . . . offered little if any specialized instruction for children with learning or emotional disabilities."). IDEA, however, requires that a child be educated in the least restrictive environment possible—that is, the one that provides "some educational benefit" and "most closely approximates" the education a disabled child would receive if she had no disability, *Kerkam v. Superintendent, District of Columbia Public Schools*, 931 F.2d 84, 86 (D.C. Cir. 1991); *see also* 20 U.S.C. § 1412(a)(5)(A). ("to the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled"). Given this, we cannot see how the fact that Grier was designed to help K.E. thrive educationally in a normal classroom environment could possibly be a strike against it.

Nor can Leggett's failure to challenge the IEP DCPS finally did develop—some four weeks after the school year began—have any bearing on the reasonableness of her actions with respect to the placement at Grier. After all, IDEA requires the school system to have an IEP in place by the start of the school year, so it cannot be that Leggett had to challenge an IEP that was completed in late September and that she did not see until sometime in October before she could obtain reimbursement for a placement she chose in August.

Although not saying so directly, DCPS seems to imply that Leggett's failure to object to the IEP was significant because K.E. could have returned to Wilson for the second semester of the 2012

school year, after school officials had completed the allegedly acceptable IEP. Before even considering that possibility, however, we would need to know a lot more: Was the IEP in fact adequate? Would returning to Wilson have unduly disrupted K.E.'s education? Were K.E.'s tuition, room and board, and other fees refundable mid-year? Neither DCPS nor the record tells us anything about these critical questions. We thus leave it to the district court to give DCPS an opportunity—should it want one—to show that Leggett's failure to return K.E. to Wilson for the second half of the 2012–13 school year was unreasonable.

Finally, DCPS insists that it was *per se* unreasonable for Leggett to choose a school that was a three-hour drive from the District of Columbia and cost $58,100 per year. True, "total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." *Carter*, 510 U.S. at 16. And $58,000 is a lot of money. But if a student requires special education, if school officials fail to offer it, and if the only private school that could serve the student's needs—that is, the only school "reasonably calculated to offer educational benefit"—is not within commuting distance and costs $58,000 (or even more) then it cannot be unreasonable for the child's parent to send her there. Here, because DCPS offered no IEP at Wilson, identified no suitable alternative, and failed even to challenge Leggett's claim that Grier was the only available placement, Grier was "the only program supported by any evidence in the record," *McKenzie*, 771 F.2d at 1535. It was thus not "unreasonable" for Leggett to send K.E. there.

## D.

To sum up, given that DCPS failed to provide K.E. a FAPE at Wilson or anywhere else, that the Grier placement was "reasonably calculated to offer educational benefit," that the residential program was "necessary" to achieve that objective, and that DCPS has, on this record, failed to show that Leggett acted "unreasonabl[y]," Leggett is entitled under the Act and the

regulation to reimbursement for tuition, room and board, and any other costs necessary to attend Grier. That said, on remand the district court may reduce this amount if, as explained above, the IEP DCPS finally generated was adequate and the school district can demonstrate that Leggett's refusal to return K.E. to Wilson at the end of the first semester was "unreasonable[]." 20 U.S.C. § 1412(10)(C)(iii)(III). (Leggett's eligibility for reimbursement for the 2013–14 school year is the subject of a different case.) The district court may also deny reimbursement for any cost, e.g., extracurricular activities, horseback riding, or excessive travel, that it finds was either not "primarily oriented toward enabling [K.E.] to obtain an education," *Dale M.*, 237 F.3d at 817—that is, not "necessary" within the meaning of the regulation—or otherwise "unreasonable," *Carter*, 510 U.S. at 16 ("Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required. Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable.").

## III.

We understand that requiring a school system to reimburse parents for the costs of expensive private boarding schools diverts funds away from public education. But where, as here, the school district has failed to provide a free appropriate public education in either a public or a non-residential private school, where the residential school the parent selected is "reasonably calculated to provide educational benefits," where the residential component of that school is "necessary" for the child to attend that school, and where the school system has not shown that the parent acted unreasonably, IDEA *requires* reimbursement for tuition, room and board, and other related educational expenses—even if costly. Moreover, and contrary to the district court's fear that if Leggett prevails parents will have "carte blanche" to choose an expensive private school, *K.E. v. District of Columbia*, 19 F. Supp. 3d at

151, the Supreme Court emphasized in *Carter* that under IDEA, school officials have complete control over the situation, *i.e.*, to avoid burdensome reimbursement obligations, they need only offer each child a free appropriate public education, either in a public school or in a private school the district chooses. *Carter*, 510 U.S. at 15–16. This, according to the Court, "is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims." *Id.* at 15. Like any other public school system, then, DCPS can avoid cases like this one simply by ensuring that its employees understand and fulfill the school system's obligations under IDEA—to provide a FAPE and to do so in a timely manner—and that they answer the phone when it rings.

For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

*So ordered.*