[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14847

_____

D.C. Docket No. 2:19-cv-00047-AKK

J.N.,
as mother and next friend of M.N., a minor

Plaintiff-Counter Defendant-Appellant,

versus

JEFFERSON COUNTY BOARD OF EDUCATION,

Defendant-Counter Claimant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 10, 2021)

Before WILLIAM PRYOR, Chief Judge, GRANT and TJOFLAT, Circuit Judges.

GRANT, Circuit Judge:

This appeal requires us to decide whether compensatory education is an automatic remedy for a child-find violation under the Individuals with Disabilities Education Act. It is not. Compensatory educational services are designed to

counteract whatever educational setbacks a child encounters because of IDEA violations—to bring her back where she would have been but for those violations. The decisionmaker must analyze whether compensatory services are necessary, and if so, what they should be. That exercise will always be fact-intensive, and the evidence needed will vary in nature and quantity from case to case. But at least some proof is required above and beyond the incorrect assumption that compensatory relief must be offered in response to a procedural violation.

At minimum, a parent must offer evidence that a procedural violation—like the child-find violation asserted here—caused a substantive educational harm, and that compensatory educational services can remedy that past harm. Because the claimant here did not provide such evidence, it was within the district court's equitable discretion to deny compensatory educational relief. That denial also means the claimant here is not a prevailing party for purposes of attorney's fees, so we affirm the district court's judgment on both grounds.

I.

Congress passed the Individuals with Disabilities Education Act "to ensure that all children with disabilities have available to them a free appropriate public education." 20 U.S.C. § 1400(d)(1)(A). At its core, the Act is a set of procedural requirements that the States must respect in exchange for funding. *See id.* § 1412. "But the procedures are there for a reason." *Endrew F. ex rel. Joseph F. v. Douglas Cty. School Dist. RE-1*, 137 S. Ct. 988, 1000 (2017). Taken together, they back up the Act's substantive educational guarantee that disabled students will receive a "free appropriate public education." A free appropriate public education,

2

as the statute makes clear, "includes both special education and related services." *Id.* at 994 (quotations omitted). "Special education" is defined as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability," while "related services" are the "supportive services" required for a child to benefit from the special education. 20 U.S.C. § 1401(26), (29).

Coordinating all these services can get complicated, so the Act requires a plan. The individualized education program, commonly known as the IEP, is the "centerpiece" of the Act's "delivery system" for its educational guarantee. *Honig v. Doe*, 484 U.S. 305, 311 (1988); 20 U.S.C. § 1401(9)(D). An IEP is a "written statement for each child with a disability" that includes "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals, including academic and functional goals," and "a statement of the special education and related services" to be provided to the child. 20 U.S.C. § 1414(d)(1)(A)(i). The Act's standard for IEPs, though implicit, is substantial: they must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001.

But these requirements would be rather empty if schools could avert their eyes from students who needed extra services. That is where the Act's "child-find" duty comes in. States receiving IDEA funding must have policies and procedures in place to ensure that "[a]ll children with disabilities residing in the State" are "identified, located, and evaluated." 20 U.S.C. § 1412(a)(3)(A). The child-find duty requires an evaluation of any child who is "suspected of being a child with a disability," and when the state overlooks clear signs of disability or

negligently fails to order testing, it violates its duty under the Act. 34 C.F.R.
§ 300.111(c)(1); *see Durbrow v. Cobb Cty. School Dist.*, 887 F.3d 1182, 1196
(11th Cir. 2018). Here, Molly's[1] mother claims that the Jefferson County School
District committed a child-find violation when it failed to formally evaluate Molly
sooner than it did.

## II.

Molly was diagnosed with Attention Deficit Hyperactivity Disorder at an
early age. She had been on medication, though her mother eventually made the
decision to take her off of it. (The timing of that decision is not clear from the
record, but it appears to have happened at some point before sixth or seventh
grade.) When Molly and her twin sister started sixth grade, their mother noted
Molly's diagnosis on the enrollment form. In her mother's words, sixth grade
"wasn't so bad" for Molly—only one incident on her record led to a brief
disciplinary period of alternative schooling, and she was receiving As in science,
Bs in English, and Cs in math.

Things got more difficult in seventh grade. Molly's grades dropped
significantly—she began receiving Cs in both English and science. But Molly's
main struggle was in math, so her math teacher "would bring her in for one-on-one
conversations." Though her grades remained poor, Molly's teacher felt that she
demonstrated a grade-level-appropriate understanding of the math concepts during
their separate sessions. And while Molly's declining performance was

---

[1] The child's name has been changed to preserve her privacy. In the complaint, Molly is
identified as M.N.

disappointing, it was not unique. According to the school principal, the academic struggles of seventh graders in math are a "nationwide conundrum."

Aside from academics, Molly began to exhibit more behavioral problems—particularly when she was in the same class as her sister. The girls' English teacher emailed their mother, reporting that while the sisters behaved "fine" when separate, together they "exhibit[ed] attention-seeking behavior, blurting things out in class" and "yelling across the room." In response, school officials separated Molly and her sister, and their mother said that measure "seemed to help." But Molly's struggles progressed beyond sibling mischief; she was unable to "keep up with the coursework" in music class, and there too the teacher said that she "talked a lot in the class." Even so, she often received As.

Eighth grade was more of the same, at least in math. Molly continued to receive Ds in that subject, and apparently misbehaved "a lot." Some of that might have been due to eighth grade itself—Kimberly LaFoy, Molly's math teacher that year, thought it was "pretty common" for students to "underperform out of the gate" in eighth grade math. According to LaFoy, a 26-year-veteran teacher with an advanced degree in curriculum instruction, the complexity of the math problems "increases tremendously" after seventh grade, and eighth graders have the added difficulty of learning to "adjust to the expectations" of preparing for high school.

Molly's problems did not go unnoticed. Her mother had been discussing her progress with LaFoy that year and, in one conversation, asked whether the school had prepared an IEP for Molly. LaFoy explained that it had not, but reassured her that Molly was "already receiving help." LaFoy gave Molly "extra help in class"

and also met with her to review the material during a free school period.  And LaFoy's individual efforts were not the extent of it—Molly's school had activated what it called a "problem solving team," which brought together teachers and administrators to coordinate the provision of additional support or accommodations to struggling students.

Molly's problem solving team started its work on October 3.  And two months later, Molly was referred for a special education evaluation, placing her on the road to receiving an IEP.  Even so (five days after the school's IEP referral), Molly's mother filed an administrative complaint with the Alabama State Department of Education alleging that the school board "failed to provide [Molly] a free, appropriate public education."  Specifically, the complaint stated that the Board failed to "[i]dentify and evaluate [Molly] in all areas of suspected disability" and failed to "[e]valuate, develop, and implement an IEP."  Molly's mother requested "compensatory education," a form of relief that consists of "extra educational services designed to compensate for a past deficient program."  *See R.L. v. Miami-Dade Cty. School Board*, 757 F.3d 1173, 1178 (11th Cir. 2014).  But the hearing officer dismissed the complaint a little over a month later, at the end of January 2017, finding that the claims were premature because the school board's evaluation of Molly was not yet complete.

A month and a half later, in mid-March, the Board finalized its evaluation and agreed that Molly was in fact eligible for special education services.  A week after that, Molly's mother appealed the hearing officer's dismissal of her complaint

to the district court, where both she and the school board voluntarily consented to having a magistrate conduct the proceedings.

In March of Molly's eighth grade year, the school board provided her with an IEP. Her appeal was still pending, and about a year and a half later the magistrate vacated the hearing officer's dismissal of the administrative complaint. He held that "there is no language in the IDEA that requires a party to wait until after a proposal or refusal to evaluate before challenging a school district's 'child find' efforts." He therefore remanded for the hearing officer "to determine whether the Board violated its 'child find' obligations, and, if so, the appropriate amount and type of compensatory education or other relief necessary, if any." On remand, the hearing officer found that the Board violated its child-find duty and "overlooked clear signs of disability" for Molly. Even so, the hearing officer did not award compensatory education, because the record lacked any testimony on Molly's need for that kind of relief besides her mother's view that she should have it.

The decision pleased no one. Both sides appealed to the district court—with Molly's mother challenging the denial of compensatory relief and the Board seeking to overturn the child-find violation. Molly's mother also sought attorney's fees.

The district court affirmed the hearing officer's decision. It upheld the determination that the Board violated its child-find duty, and it affirmed the denial of compensatory education. For the latter, the district court found that Molly's mother had failed to meet her burden of proof in two respects: she failed to show

that the Board's child-find violation resulted in a denial of a free appropriate public education for Molly, and she failed to show any deficiency in her education requiring remediation. As for the request for attorney's fees, the district court noted that, at the time Molly's mother filed her administrative complaint, the Board had already started the process of developing an IEP. Because Molly's eventual IEP was not the result of litigation, her mother was not a prevailing party. The district court therefore refused to grant attorney's fees. Molly's mother appealed.

## III.

The party seeking relief under the IDEA bears the burden of proof before the hearing officer. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005). And when a district court reviews the hearing officer's ruling, "it must make a decision based on the preponderance of the evidence and give due weight to the ALJ's conclusions." *L.J. ex rel. N.N.J. v. School Board of Broward Cty.*, 927 F.3d 1203, 1210 (11th Cir. 2019) (quotation omitted).

When we consider a district court's determination of liability under the IDEA, we review questions of law de novo. *Id.* We review findings of fact for clear error, but when the evidence before the district court is the same as what was before the hearing officer, "we stand in the same shoes as the district court in reviewing the administrative record," and apply the same "due weight" standard. *Id.* (quotation omitted). That is, we may "accept the conclusions of the ALJ and district court that are supported by the record and reject those that are not." *Id.*

We review any grant (or denial) of relief by the district court for an abuse of discretion. *R.L.*, 757 F.3d at 1182.

IV.

Molly's mother says that the district court, because it found that the school board violated its child-find duty, should have utilized its "broad discretion and equitable authority" to award compensatory education for Molly. But compensatory education is a backward-looking remedy crafted in response to a substantive violation of the IDEA—one that denied a child the free appropriate public education to which she was entitled. A child-find violation, on the other hand, is a procedural matter. It may well be that child-find violations often lead to the denial of a free appropriate education. But that conclusion is not mandatory; a parent must show that the child's educational program was substantively deficient, and that compensatory educational services are necessary to place the child in the same place she would have been absent a violation of the Act.

Here, the district court was well within its "broad discretion and equitable authority" when it concluded that Molly's mother had not shown that the school board's child-find violation resulted in educational deficits for Molly that could be remediated with prospective compensatory relief. And because the school began its special education referral process before Molly's mother filed suit, she cannot show that she is entitled to attorney's fees. We therefore affirm the district court on both fronts.

9

A.

Molly's mother says that because the Board violated its child-find obligation her daughter should—automatically—receive compensatory education. But even if the Board did commit a child-find violation (a conclusion that the Board contests, but one that we need not consider),[2] Molly's mother has not shown that compensatory education is required.

Her argument presumes an equivalency between a procedural violation and a substantive harm, but that one-to-one relationship does not exist under the IDEA. A plaintiff is entitled to substantive relief based on a procedural violation of the Act only when that violation causes a substantive harm. *L.M.P. ex rel. E.P. v. School Board of Broward Cty.*, 879 F.3d 1274, 1278 (11th Cir. 2018). "In evaluating whether a procedural defect has deprived a student of a FAPE [free appropriate public education], the court must consider the impact of the procedural defect, and not merely the defect per se." *School Board of Collier Cty. v. K.C.*, 285 F.3d 977, 982 (11th Cir. 2002); *see also Leggett v. District of Columbia*, 793 F.3d 59, 67 (D.C. Cir. 2015). In other words, a procedural problem will not always result in a violation of the Act's substantive educational guarantee.

On this point the IDEA's language is explicit. In "matters alleging a procedural violation," a hearing officer may find that a child did not receive a free appropriate public education only if the procedural problem "impeded the child's right to a free appropriate public education," "significantly impeded the parents'

---

[2] Though the school board argues the point as an alternative ground for affirming the decision below, the board did not cross-appeal the district court's holding that it committed a child-find violation.

opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education" to their child, or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). The right to relief, then, turns on whether a given violation "results in loss of educational opportunity for the student." *Leggett*, 793 F.3d at 67 (alterations adopted and quotation omitted); *see also D.K. v. Abington School Dist.*, 696 F.3d 233, 249 (3d Cir. 2012).

This point also follows from the Act's structure. Its procedural requirements impose a framework designed to guide schools and parents through a complex process, one necessarily tailored to each individual child. There is no one-size-fits-all solution. Schools must assess the "present levels of achievement, disability, and potential for growth" of "a wide spectrum" of children and then educate them adequately, all while recognizing that their achievements will "differ dramatically." *Endrew F.*, 137 S. Ct. at 999 (quoting *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 202 (1982)). So while the IDEA's procedures are central to the statute's operation, they are not there for their own sake; they enable parents and schools to ensure that each student has "an educational program reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *See id.* at 1001; *see also Durbrow*, 887 F.3d at 1189. As a result of this design, the remedy for a procedural failing is generally to require that the procedure be followed. And where the IDEA's educational guarantee itself is violated, substantive remedies like compensatory education may be available.

11

So to succeed in her claim, Molly's mother needs to show more than a child-find violation. She needs to show that Molly's education "would have been different but for the procedural violation." *See Leggett*, 793 F.3d at 68 (emphasis omitted). Compensatory education, after all, is designed to make up for a substandard educational program offered as a result of an IDEA violation. *See Draper v. Atlanta Indep. School Sys.*, 518 F.3d 1275, 1280 (11th Cir. 2008). As an equitable remedy that "vindicates the student's substantive right" to receive a free appropriate public education, compensatory education—as its name suggests— "compensates for a past deprivation of educational opportunity rather than a deprivation of purely procedural rights." *Garcia v. Board of Ed. of Albuquerque Pub. Schools*, 520 F.3d 1116, 1125 (10th Cir. 2008) (emphasis omitted). Any compensatory award, therefore, must be designed to provide a student with the educational benefits that she would have received had the school provided appropriate special education services in the first place. *See Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 524 (D.C. Cir. 2005). Compensatory education "should place children in the position they would have been in but for the violation of the Act." *Draper*, 518 F.3d at 1289.

Molly's mother does not dispute that she has the burden of showing entitlement to relief, but she does seem to misunderstand what she must do to meet that burden. She argues that she "proved by a preponderance of the evidence that [Molly] needed compensatory education." But she backs up that contention only by stressing that because the district court identified a child-find violation, it necessarily had to conclude that Molly also needed compensatory education. She

12

points to the same evidence that supported the child-find violation: the information she shared about Molly's condition in conversations with teachers, as well as Molly's grades, test scores, and behavioral incidents.

What Molly's mother does not argue is that the services the school provided were worse than what Molly would have received if the school had more quickly developed an IEP. Indeed, all she does is recount Molly's difficulties in middle school. Low grades and behavioral incidents may show that Molly suffered from ADHD and that she struggled in the classroom—probably even more than most. But that is not enough to show that the educational opportunity Molly received was substantively different than what she would have gotten with a more timely IEP, or that her education was otherwise deficient. *See Leggett*, 793 F.3d at 67.

As Molly's mother admitted, sixth grade "wasn't so bad," and Molly's grades bear that out—based on her transcript, the district court noted that Molly "generally earned good or average grades" that year. Although her grades did drop in subsequent years, that alone does not show that her education was deficient or that the extra services provided were worse than those she would have received with an IEP. And as the school principal and LaFoy testified, seventh and eighth grade math present special challenges to all middle school children, not just those with disabilities.

In addition, even before Molly's IEP was implemented, the school was working to meet her specific and individual needs. For one, Molly's seventh grade math teacher provided one-on-one instruction to Molly and told the principal that Molly "was able to demonstrate that she knew the concepts that they were

13

covering." For another, the school activated a problem solving team intervention for Molly. She also got "extra help in class." And when Molly's behavior was especially disruptive to her learning, her teacher reached out to her mother, and the school successfully addressed the issue by separating Molly and her twin into different classes.

The argument that compensatory education is mandatory here also ignores both the district court's broad equitable authority to grant relief (or not) and our standard for reviewing that decision: abuse of discretion. In an action challenging the hearing officer's decision, the district court, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). To be sure, compensatory education is one such form of relief that can be granted under that provision. *R.L.*, 757 F.3d at 1178. But without any evidence of how an earlier IEP would have helped Molly, what services she should have received, or what learning deficits she suffered as a result of not having an IEP, we cannot say that the district court abused its equitable authority by failing to craft its own compensatory plan. The district court was within its discretion to conclude that such look-back services were not required on the facts of this case. Because Molly's mother has not shown that the child-find violation caused Molly to suffer a violation of the IDEA's substantive educational guarantee, she has not shown the district court's denial of compensatory education to be an abuse of its "broad" discretion. *See Blount Cty. Board of Ed. v. Bowens*, 762 F.3d 1242, 1246 (11th Cir. 2014) (quoting *School Comm'n of Burlington v. Dep't of Ed.*, 471 U.S. 359, 369 (1985)).

14

B.

Molly's mother also argues that the district court erred in denying her attorney's fees. In an action or proceeding brought under the IDEA, the district court "may award reasonable attorneys' fees as part of the costs[] to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i). Here, the district court denied attorney's fees because it found that Molly's mother was not a prevailing party. She claims that was error because she succeeded in getting a remand to the hearing officer, who then concluded that the school board violated its child-find duty.

We agree with the district court that those limited successes do not turn Molly's mother into a prevailing party. Without a contrary legislative directive, "a prevailing party is one who prevails on any significant issue and thereby achieves some of the benefits sought by bringing suit." *Friends of the Everglades v. S. Florida Water Mgmt. Dist.*, 678 F.3d 1199, 1201 (11th Cir. 2012) (quotations omitted). As the Supreme Court has put it, to merit attorney's fees under the prevailing party standard, a party must achieve "some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). That did not happen here. The record shows that Molly was referred for a special education evaluation before her mother set this suit in motion; in other words, Molly's eventual IEP was not the fruit of this litigation. Nor did Molly's mother receive the compensatory education services she sought. Because Molly's mother did not achieve any substantive benefit from this litigation, we see no abuse of discretion in the district court's denial of her attorney's fees request.

15

\*    \*    \*

The IDEA provides both procedural and substantive guarantees to children with disabilities.  But substantive relief is available only in the face of a substantive violation.  Even then, the relief is equitable in nature, and the hearing officer and district court have significant latitude to craft a solution appropriate for the child's particular circumstances.  Because there was no substantive violation here, we **AFFIRM** the district court's judgment that neither compensatory education nor attorney's fees were required.