# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 5, 2017          Decided May 1, 2018

No. 16-7113

Z. B., A MINOR, BY HER PARENTS AND NEXT FRIENDS, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA, A MUNICIPAL CORPORATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01037)

*Michael J. Eig* argued the cause and filed the briefs for appellants.

*Richard S. Love*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With him on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General at the time the brief was filed, and *Loren L. AliKhan*, Solicitor General.

Before: MILLETT and PILLARD, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  Z.B. is an elementary school student who, from pre-kindergarten through third grade, attended the Phoebe Hearst Elementary School in the District of Columbia Public Schools system (DCPS).  Her parents claim that DCPS failed to offer Z.B. a fourth grade education appropriate to her needs under the Individuals with Disabilities Education Act (IDEA or Act).  Because they thought the education at Hearst was deficient, they withdrew Z.B. in the summer of 2014 and enrolled her at the Lab School, a private school for children with disabilities.  By all accounts, Z.B. did well at the Lab School.  DCPS, however, stands by the adequacy of the individualized education programs (IEPs) Hearst offered, so it denied Z.B.'s family reimbursement under the IDEA of the tuition costs at the Lab School.

On cross-motions, the district court granted summary judgment for DCPS.  The court determined that DCPS, after reviewing and responding to diagnostic information and action requests from Z.B.'s parents, offered Z.B. an adequate education.  The Supreme Court thereafter, in *Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1*, 137 S. Ct. 988 (2017), raised the bar on what counts as an adequate education under the IDEA.  *Endrew F.* held that the Act requires education "reasonably calculated to enable a child to make progress in light of the child's circumstances"—a standard that the Court described as "markedly more demanding than the 'merely more than *de minimis*'" standard the Tenth Circuit had applied, *id.* at 999-1000, and that also appears more demanding than the district court's approach here, *see Z.B. v. District of Columbia*, 202 F. Supp. 3d 64, 75-80 (D.D.C. 2016).  In requiring more than merely some "educational benefits," *id.* at 77 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)), the Court in *Endrew F.* stressed that "every child should have the chance to meet challenging objectives," and that a student's "educational

program must be appropriately ambitious in light of his circumstances." 137 S. Ct. at 1000.

The district court ably and extensively engaged the record in this case, but we discern certain errors in the legal standards it applied. The court excused arguable shortfalls in the IEP DCPS offered to Z.B. in June 2014 because of "the short time frame between the eligibility determination and the adoption of the initial IEP." 202 F. Supp. 3d at 80. The court did not explain, however, why that short time frame was not DCPS's own fault. The IDEA places affirmative obligations on schools, but the district court appears to have accepted DCPS's passivity: Z.B.'s parents, not DCPS, finally procured the evaluations used for the 2014 IEP. And the court affirmed the administrative finding that the 2014 IEP was adequate in part because, when the school "was made aware" by Z.B.'s parents of their "issues" with an initial version of that IEP, the school "agreed to all of plaintiffs' proposed changes." *Id.* It thus remains unclear whether and how DCPS itself made a valid assessment of Z.B.'s needs before it offered the 2014 IEP—and so whether that IEP was adequate.

The district court also faulted Z.B.'s parents for failing to show that Z.B.'s special education needs could not be met "within DCPS." *Id.* at 66; *see id.* at 75-79. But the legal issue is not whether, as a general and hypothetical matter, the school system as a whole somehow could have met Z.B.'s needs; it was not Appellants' burden to show that any possible placement in DCPS "was *not* a viable option" or "would not have worked." *Id.* at 76-77. The issue, rather, is whether each of the IEPs that Hearst actually proffered was adequate at the time; if not, DCPS may be responsible to pay for an education that was.

4

Given the legal standard the district court actually applied, we are not confident that DCPS met its duty under *Endrew F.* to evaluate Z.B. and offer a 2014 IEP that adequately responded to her needs: Was it too little, too late? We thus vacate and remand for further consideration of the substantive adequacy of Z.B.'s 2014 IEP under the standards of the IDEA as *Endrew F.* and this opinion describe them.

The second IEP DCPS offered in 2015, which Z.B.'s parents also challenge as inadequate, is a different story. By the time it composed the 2015 IEP, DCPS had fully familiarized itself with Z.B.'s individual circumstances and needs. Hearst had by then made its own evaluation of the information Z.B.'s parents and the Lab School provided, and conducted its own further assessments of Z.B. The record shows that the IEP DCPS offered Z.B. in 2015 was supported by the requisite analysis of Z.B.'s circumstances, and that it was reasonably calculated to afford her an opportunity to make progress in light of her particular circumstances. We accordingly affirm the decision of the district court as to the adequacy of the 2015 IEP.

I.

A.

The IDEA, 20 U.S.C. § 1400 *et seq.*, offers states federal funding to provide a "free appropriate public education" to students with disabilities, *id.* § 1412(a)(1)(A). The IDEA details evaluation procedures that schools must use to determine precisely what services an eligible child should receive. *See id.* §§ 1414(a)-(b); *see also* 34 C.F.R. § 300.301, 300.304-06. Operationally, when a school has reason to believe that a child with a disability is not receiving an adequate education, *see* 20 U.S.C. § 1412(a)(3), it must first take initiative to "review existing evaluation data," including those

the parents may have provided and observations of teachers and other professionals, "before" it begins providing services under the IDEA. *Id.* §§ 1414(a)(1)(A), (c)(1)(A). "[O]n the basis of that review, and input from the child's parents," the school must "identify what additional data, if any, are needed to determine" the child's current needs and skills. *Id.* § 1414(c)(1)(B). The burden is on the school to "ensure that . . . the child is assessed in all areas of suspected disability." *Id.* § 1414(b)(3)(B). If the school determines additional assessment is needed, the school is responsible for conducting that assessment. *Id.* § 1414(c)(2). If, however, the school determines no more data is needed to create an adequate educational program tailored to the student's needs, it must so notify the child's parents and inform them of their right to request further assessment. *Id.* § 1414(c)(4).

With the "results of [that] initial evaluation" before it, the school and the parents—together, the "IEP Team," *see id.* § 1414(d)(1)(B)—must design an individualized education program. *Id.* § 1414(d)(3)(A)(iii). An IEP operationalizes a specific student's appropriate educational plan: It sets out, in writing, the student's existing levels of academic and functional performance, establishes appropriate goals, and describes how the student's progress toward those goals will be measured. *Id.* § 1414(d)(1)(A)(i)(I)-(III); *see id.* § 1401(9)(D). Failure to follow those procedures is actionable where it denies the child an appropriate education. *Id.* § 1415(f)(3)(E)(ii)(I).

Substantively, the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *Endrew F.*, 137 S. Ct. at 1001, even as it stops short of requiring public schools to provide the best possible education for the individual child, *Rowley*, 458 U.S. at 200, or an education "equal" to that of non-disabled peers, *Endrew F.*, 137 S. Ct. at 1001; *Rowley*,

458 U.S. at 198-99. If a school system fails to provide a student with an appropriate education and such education is offered at a private school, the school system may be liable to reimburse the student for the cost of private education. *See* 20 U.S.C. § 1412(a)(10)(C)(ii); *see generally Leggett v. District of Columbia*, 793 F.3d 59 (D.C. Cir. 2015).

B.

Z.B. began her schooling in pre-kindergarten at DCPS's Hearst Elementary School. Because Hearst was not Z.B.'s neighborhood school, she was able to enroll there only after winning a place through a DCPS lottery.[1] In their initial administrative complaint, Z.B.'s parents claimed they first noticed in pre-kindergarten that Z.B. struggled to pay attention and that her impulsivity and disorganization increasingly affected her daily functioning and ability to learn at school. The record contains neither evidence of any steps taken by DCPS to evaluate Z.B. during her pre-kindergarten or kindergarten years for possible disabilities, nor any direct explanation that such steps were unnecessary.

Z.B.'s first and second grade experiences were marked by bullying and other interpersonal conflicts between Z.B. and other students, which her parents claim prompted Z.B. to behave inappropriately and negatively affected her academic progress. Nothing in the record suggests that DCPS then evaluated Z.B. to determine whether she was eligible for special education under the IDEA. Concerned about her behavior and academic performance, Z.B.'s parents took her in the spring of her second grade year for a private psychological evaluation at their own expense. In March 2013, a doctor at Children's National Medical Center (Children's) diagnosed

---

[1] Unless noted otherwise, the facts recounted are drawn from the administrative record before the Hearing Officer and District Court.

Z.B. with "[a]ttention deficit hyperactivity disorder combined type" (ADHD). That doctor also recommended that Z.B. receive a functional behavioral assessment.

Z.B.'s parents hired a therapist at Children's to work with Z.B. soon after that diagnosis. On May 1, 2013, near the end of Z.B.'s second grade year, the therapist wrote DCPS to recommend developing a Section 504 plan for Z.B. A Section 504 plan, named after the section of the Rehabilitation Act of 1983 in which it was established, defines and commits to provide public support for persons with disabilities. *See* 29 U.S.C. § 701 *et seq.*; *see generally Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749-50 (2017). While the IDEA applies to all school-aged children, 20 U.S.C. §§ 1401(3)(A), 1412(a)(1), Section 504 applies more broadly to federally financed programs or activities, requiring as a condition of public funding that recipients provide certain accommodations for physically or mentally impaired individuals, 29 U.S.C. §§ 705(20)(A), 794(a)-(b), and, in the school context, requires a free, appropriate education for students with qualifying disabilities, 34 C.F.R. § 104.33.

DCPS developed a Section 504 plan for Z.B. within two weeks of receiving the private therapist's request. The plan provided for classroom accommodations such as simplified directions, extra time, and preferential seating in the classroom to minimize distractions. After DCPS implemented the Section 504 plan, Z.B.'s father periodically contacted the school with concerns about the slow pace of Z.B.'s progress. He testified that, after DCPS implemented Z.B.'s section 504 plan, school officials were "dragging their feet on getting" Z.B. tested. Joint App'x (J.A.) 326.

Z.B.'s parents report that her "situation came to a head" after she received a threatening note on the playground in the

spring of third grade. J.A. 9, 129. They maintain that Z.B. experienced significant distress in the period following the note, including bouts of insomnia and physical illness. Her parents alleged in their administrative complaint that, though Z.B.'s struggles did not subside, DCPS failed to refer her for special education and still refused to test her for learning disabilities. Instead, Z.B.'s parents—again at their own initiative and expense—took her for a psychiatric evaluation at Children's.

In May 2014, licensed psychologist Dr. Jacqueline Sanz, an expert in neuropsychology, oversaw the evaluation. Her report concluded that Z.B. had ADHD, "weakness" in math and written expression, attention and executive functioning challenges, and "problems with anxiety, depressed mood, oppositional behavior, and social skills." J.A. 56-57. Dr. Sanz also reported Z.B. struggled with impulsivity, inattention, and "mood dysregulation." J.A. 58. Based on her evaluation, Dr. Sanz recommended that Z.B. receive specialized instruction, classroom accommodations, and various therapies to support her learning. Z.B.'s parents shared the report with Z.B.'s teacher and principal at Hearst.

In May 2014, near the end of Z.B.'s third grade year—four school years into an elementary school experience that by Z.B.'s parents' account was not working from its start—Hearst's principal scheduled an IEP eligibility meeting. The meeting was scheduled at Z.B.'s parents' request, to respond to the report that Z.B.'s parents had obtained from Dr. Sanz.

Within approximately two weeks of receiving Dr. Sanz's report, DCPS developed the 2014 IEP for Z.B. That IEP described Z.B.'s then-current levels of achievement and set goals for her in math, written expression, and emotional, social, and behavioral development. It provided that Z.B. would

receive one hour per day of specialized math education outside the general classroom, thirty minutes per day of specialized written expression instruction within the general classroom, and one hour per week of behavioral support services outside the general classroom. It also provided that Z.B. would continue to receive the services called for in her Section 504 plan. DCPS put the IEP into effect immediately.

Four days later, a week and a half before the scheduled end of the school year, Z.B.'s parents withdrew her early from Hearst to enroll her in a summer camp session that began before the public school semester concluded. Then, on August 28, 2014, Z.B.'s mother notified Hearst that she was withdrawing Z.B. and would instead enroll her at the Lab School, a private K-12 day school in the District for students with learning disabilities. Z.B. began her fourth grade year (2014-15) at the Lab School, which developed an IEP for her in mid-October of 2014.

Late in 2014, pursuant to its statutory obligation to provide an IEP every school year for each eligible child in the jurisdiction, *see* 20 U.S.C. § 1414(d)(2)(A), DCPS for the first time conducted its own formal evaluations of Z.B. to prepare to develop its 2014-15 IEP for her (hereinafter 2015 IEP). A DCPS social worker in November 2014 administered a functional behavioral assessment by observing Z.B. at the Lab School and interviewing her, her parents, and her teachers. DCPS also administered an occupational therapy assessment around the same time.

In December of 2014, with Z.B. attending the Lab School, Z.B.'s parents met with the DCPS IEP team to discuss possible revisions to its draft of this second IEP. DCPS worked to update Z.B.'s IEP and, by January 2015, finalized a program that contemplated serving her educational needs at Hearst.

The DCPS 2015 IEP provided for nine hours of specialized instruction per week outside the general classroom (five in math, three in written expression, and one in reading), and one hour per week of specialized reading instruction in the general classroom. On top of those instructional services, the IEP included two hours per month of behavioral support services outside and another two hours per month inside the general classroom; half an hour per week of occupational therapy outside the general classroom; and half an hour per month of occupational therapy consultation. That IEP incorporated all of the information offered and requests made by Z.B.'s parents and lawyer, but specified that Z.B. would attend Hearst. She would have received some of her education inside the general classroom there rather than all of it in the special-education classroom as she did at the private Lab School—which exclusively serves students with disabilities, and which her parents preferred.

## C.

Z.B.'s parents then filed a due process administrative complaint against DCPS. An impartial hearing officer at the D.C. Office of the State Superintendent of Education oversaw three days of testimony from several witnesses. In a determination that the district court described as unworthy of deference because it lacked "a detailed and reasoned explanation of how the evidence supports its findings and conclusions," 202 F. Supp. 3d at 74, the hearing officer held that the 2014 and 2015 DCPS IEPs were both reasonably calculated to provide Z.B. an appropriate education, so DCPS owed Z.B.'s parents no reimbursement, *see* Hearing Officer Determination at 10-13. The hearing officer held that DCPS did not deny Z.B. an appropriate education by failing to include certain requested goals and additional special instruction, or by setting Hearst, rather than a full-time special-education school,

as her educational institution. DCPS also did not fall short, the hearing officer held, by relying on "the information the [IEP] team had at the time," including outside evaluations and recommendations—all of which were provided by Z.B.'s parents—"even though other assessments were needed." *Id.* at 10-11.

Z.B.'s parents filed suit in district court challenging the hearing officer's determination. On cross motions for summary judgment, the court held that both of DCPS's IEPs— for 2014 and 2015—were reasonably calculated to provide Z.B. an appropriate education. The court first asked "whether removing Z.B. from DCPS is necessary to provide her with an education that is 'reasonably calculated to enable the child to receive educational benefits'" within the meaning of *Rowley.* 202 F. Supp. 3d at 77 (quoting 458 U.S. at 207). It answered in the negative: Nothing in Dr. Sanz's report, the court reasoned, expressly or implicitly determined that Z.B. required full-time special education, *id.* at 75-76, and evidence of Z.B.'s later progress at the Lab School did not show that Hearst was unable to serve Z.B.'s educational needs, *id.* at 76-77.

Regarding the 2014 IEP in particular, the court concluded that, measured principally against the descriptions and recommendations in Dr. Sanz's report, that IEP was reasonably calculated to enable Z.B. to make educational progress. *Id.* at 79-80. As part of the adequacy analysis, the district court emphasized DCPS's responsiveness under time pressure. *Id.* at 80. The 2015 IEP, too, was substantively adequate in the district court's view: It addressed all of Z.B.'s identified needs, so offered Z.B. an appropriate education for the balance of the 2014-15 school year. *Id.* The court accordingly concluded that Z.B.'s parents were not eligible for reimbursement for Lab School tuition. *Id.* at 81.

Z.B.'s parents appealed.

## II.

The question before us is whether DCPS denied Z.B. a free, appropriate public education. The IDEA requires an education "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. Understanding the particulars of a child's current skills and needs is critical to developing an "individualized" educational plan: "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* (citing 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv)). As noted above, the Act extensively details information-gathering procedures to ensure that school systems provide children with qualifying disabilities an education tailored to their distinctive needs. *See* 20 U.S.C. § 1414(d)(3)(A); *see also id.* §§ 1414(a)-(c).

Z.B. does not argue that DCPS failed to meet its threshold "child find" obligation—that is, to make its initial identification of Z.B. as a student qualifying for services under the IDEA. And DCPS does not dispute that, as of the time of her IEP eligibility meeting, Z.B. was eligible for an IEP. The parties' dispute centers on the substantive adequacy of the education DCPS offered to Z.B.—in particular, in the 2014 and 2015 IEPs.

The evaluation and information-gathering procedures of the IDEA are designed to position the IEP team—composed of both school personnel and parents—to create an IEP tailored to the student's special educational needs. Failure to follow those procedures may yield an IEP that is not appropriately tailored to the student, denying her an appropriate education. *See id.*

§ 1415(f)(3)(E)(ii); *Leggett*, 793 F.3d at 67. We consider the shortcomings Z.B.'s parents complain of in DCPS's information-gathering process to determine whether the IEPs DCPS offered substantively fell short of what the IDEA requires.

Where, as here, a district court grants a motion for summary judgment on the administrative record without accepting additional evidence, we are on appeal "in exactly the same position as the district court" and accordingly "review its decision de novo." *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 522 (D.C. Cir. 2005). Like a district court, we must give "due weight" to the hearing officer's determinations, *Rowley*, 458 U.S. at 206, but we afford "less deference than is conventional in administrative proceedings," especially when the decision is insufficiently supported by fact or reasoning, *Reid*, 401 F.3d at 521 (internal quotation marks omitted). As the party seeking relief, Z.B. bore the burden of proof at the hearing, *see Schaffer ex rel. Shaffer v. Weast*, 546 U.S. 49, 51 (2005), and bears the burden of persuasion on appeal, *see Reid*, 401 F.3d at 521.

## A.

Appellants challenge the 2014 IEP that DCPS offered to Z.B. at Hearst Elementary School as inadequate in several respects. Appellants contend that the IEP was substantively inadequate in the math and writing goals it set for Z.B., which they claim were too high given her current skill levels, and in lacking a reading goal, appropriate types and hours of instruction, specific executive functioning goals, and occupational therapy services. Across those substantive areas, in Appellants' view, DCPS dropped the ball on obtaining the information needed to provide Z.B. with an adequate and tailored IEP, including by failing to perform a functional

behavior assessment. *See, e.g.*, J.A. 9, 12; Hearing Officer Determination at 10, 11. As a result, they contend that the 2014 IEP was not reasonably calibrated to Z.B.'s needs, as measured against what the school should have known about them at the time, and they say those perceived shortcomings are confirmed by later assessments of Z.B. in preparation for the 2015 IEP.

Because an IEP must be tailored to the student's reasonably known needs at the time it is offered, the underlying evaluation of the student is fundamental to creating an appropriate educational program. "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994 (quoting *Rowley*, 458 U.S. at 181). The evaluation requirement "serves a critical purpose: it allows the child's IEP Team to have a complete picture of the child's functional, developmental, and academic needs, which in turn allows the team to design an individualized and appropriate educational plan tailored to the needs of the individual child." *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1119 (9th Cir. 2016); *see id.* at 1110-11, 1124-25.

The Act welcomes parental input, but specifically charges the evaluation of the student and the framing of an adequate IEP to the school. To be sure, that evaluation does not always require a school to conduct additional testing. When "existing . . . evaluations and information provided by the parents" and "observations by teachers" and other professionals provide the IEP Team with a reasonable picture of the student's skills and needs, the school may finalize an IEP without any further testing unless requested by the child's parents. *Id.* §§ 1414(c)(1)(A)-(B), (c)(4).

Applying the IDEA as interpreted in *Endrew F.*, we must ask whether, in developing the 2014 IEP, DCPS adequately

evaluated Z.B.'s particular needs and offered her an IEP tailored to what it knew or reasonably should have known of her disabilities at the time. *See Endrew F.*, 137 S. Ct. at 999. Without the requisite assessment of Z.B.'s needs as of the time the 2014 IEP was drafted, neither the IEP team nor reviewing officer nor the district court could determine what services were needed to provide an appropriate education, nor could we. As the Second Circuit has explained, for example, the failure to conduct an adequate functional behavioral assessment is a procedural violation that can have substantive effects, "because it may prevent the [IEP team] from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all. . . . [S]uch a failure seriously impairs substantive review of the IEP because courts cannot determine exactly what information [a functional behavioral assessment] would have yielded and whether that information would be consistent with the student's IEP." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012).

The key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to enable the specific student's progress. *See Endrew F.*, 137 S. Ct. at 999. As the district court aptly explained, that standard calls for evaluating an IEP as of "the time each IEP was created" rather than with the benefit of hindsight. 202 F. Supp. 3d at 75-76. At the same time, the district court observed, evidence that "post-dates" the creation of an IEP is relevant to the inquiry to whatever extent it sheds light "on whether the IEP was objectively reasonable at the time it was promulgated." *Id.* at 76 n.23.

Taking as the statutory baseline that DCPS had an affirmative obligation to adequately assess Z.B's needs, and that the object of our evaluation is the IEP that DCPS offered, we highlight two shortfalls in the district court's analysis that call for remand:

*First*, in holding that the 2014 IEP was reasonably calculated to provide Z.B. with an appropriate education, the district court emphasized the school's responsiveness. The IDEA does, to be sure, require schools to respond meaningfully to parents' reasonable requests. *See generally Leggett*, 793 F.3d 59, 68-70. But merely reacting when parents complain is not enough. A school has an affirmative obligation to "conduct a full and individual initial evaluation" of an eligible student "before" it begins providing services. 20 U.S.C. § 1414(a)(1)(A). If it considers only whatever information parents pass along, a school may miss what reasonable evaluation would uncover and, as a result, offer an inadequate education.

DCPS is not absolved of its statutory obligations to appropriately evaluate Z.B. simply because it offered an IEP in response to her parents' formal request for one. The district court generally recognized the school's obligation to evaluate Z.B., 202 F. Supp. 3d at 66-67, and was aware of potential inadequacies in the 2014 IEP, *see id.* at 79 (acknowledging evidence supporting parents' critiques); Hearing Officer Determination at 10-11 (acknowledging that additional assessments were needed). It excused those concerns, however, in part because of the "short time frame between the eligibility determination and the adoption of the initial IEP," and the school's willingness to address Z.B.'s parents' specific complaints once they raised them. *Id.* at 80. The Act expects schools with reason to believe that a student may be suffering from a disability to evaluate the student promptly and

appropriately. *See* 20 U.S.C. § 1412(a)(3). When data are needed to understand a child's unique needs, it is the school that "shall" administer the necessary assessments. *Id.* §§ 1414(c)(1)(B), (c)(2). Z.B. had been a student in the DCPS system for several years; even if Z.B.'s parents had never made any requests whatsoever, once DCPS was or should have been aware of Z.B.'s potential special educational needs, it was obligated to evaluate her.

To the extent that the district court relied on the premise that DCPS only needed to respond to the requests Z.B.'s parents made and incorporate the evaluations Z.B.'s parents provided, that was error. Of course, a school's ready agreement with parents to provide services is not in itself evidence (even if coupled with later additions of further remedial measures) that the district had been ignoring an obvious problem. Because, however, the district court did not directly address what DCPS would have known had it met its own obligation to evaluate Z.B. rather than waiting for and reacting to her parents' evaluations, it is not clear from the proceedings below whether DCPS would have learned anything more or different. If it would have, Z.B. may well have been entitled to a substantively different IEP from the one DCPS offered her in June 2014.

As things stand, we cannot discern whether the 2014 IEP was in fact tailored to Z.B.'s needs. It is not enough to say, as the district court and DCPS did, that the 2014 IEP accorded with the recommendations of Dr. Sanz's May 2014 report. *See* 202 F. Supp. 3d at 79-80. A reviewing court must answer the predicate question whether—combined with all other relevant data—any assessment parents may have sought and funded on their own provided a materially accurate and adequate account of the student's circumstances. While some parents may seek out private evaluations and bring them to the school's

attention—as Z.B.'s parents have commendably done here—not all parents have the resources or expertise to obtain an accurate evaluation. *See* Eloise Pasachoff, *Special Education, Poverty, and the Limits of Private Enforcement*, 86 Notre Dame L. Rev. 1413, 1437-39 (2011). Yet all students with disabilities, regardless of their parents' involvement or ability, are entitled under the IDEA to receive IEPs reasonably calculated to enable their educational progress. The school may not simply rubber stamp whatever evaluations parents manage to procure, or accept as valid and sufficient whatever information is already at hand.

Because the district court did not question whether DCPS needed additional or different metrics of Z.B.'s skills to develop the June 2014 IEP, it failed to establish a reliable baseline of Z.B.'s current needs against which to evaluate the IEP's adequacy. The district court recognized that "[t]here [was] evidence that supports plaintiffs' specific criticisms of the June 2014 IEP." 202 F. Supp. 3d at 79. In evaluating it, the court first looked for "fatal inconsistencies between the Sanz Report and the June 2014 IEP," *id.*, assuming the Sanz report sufficed as a measure of Z.B.'s needs. Somewhat in tension with that approach, the court did not consistently identify what data the school used when it set baselines and goals that departed from Dr. Sanz's evaluation. The district court relied on testimony of DCPS officials in accepting the IEP's lack of reading goals, *id.* at 80, but pointed to no testimony or other evidence in excusing the discrepancies between the Sanz report and the 2014 IEP for math and writing goals, *id.* at 79-80. In reviewing Z.B.'s contention that the IEP should have included occupational therapy goals, the court did not fault DCPS's non-responsiveness to testimony that "Z.B.'s need for occupational therapy was probably longstanding," *id.* at 73, only because of the "short time frame between the eligibility determination and the adoption of the initial IEP,"

*id.* at 80. Neither the district court's opinion nor the parties' briefing reveals whether or on what ground DCPS may have reasonably concluded that the IEP was tailored to Z.B.'s needs at that time.

Appellants contend that the content of the 2015 IEP, which offered Z.B. more specialized instruction, proves that the 2014 IEP did not take full account of Z.B.'s needs. DCPS counters that the later IEP is not relevant to the question whether the earlier IEP was adequate. The district court correctly rejected DCPS's contention that, in reviewing the IEP, the court could not consider "any evidence that was not before the IEP team at the time the IEP was adopted." 202 F. Supp. 3d at 76 & n.23. Sometimes a belatedly obtained professional opinion, for example, may suggest a longstanding problem that a school should have but failed to identify and account for earlier. At the same time, the fact that the 2015 IEP offered more services than its 2014 counterpart is not *per se* evidence that the 2014 IEP was inadequate.

We do not know whether the June 2014 IEP in fact fell short, in part because we do not know whether Z.B.'s needs, as reflected in the 2015 IEP, were already present in June 2014. The district court failed to grapple with whether, taking into account DCPS's duty to be proactive, Hearst should have offered in the 2014 IEP the full range of services it eventually offered in the 2015 IEP. We do not conclude that was the case, nor do we say that it was not.

*Second*, the district court further erred by placing an inappropriately heavy burden on Z.B.'s parents in their challenge to the 2014 IEP, requiring that they show that no IEP that DCPS could have offered would have sufficed. The district court correctly recognized that "the question before" it was "not whether placement at the Lab School is appropriate";

it erred, however, in framing as the right question "whether placement in DCPS is not." *Id.* at 76; *see id.* at 66. In determining whether the offered IEPs were reasonably calculated to provide Z.B. an appropriate education, the pertinent question is what DCPS actually offered, not what it is "capable of providing," *id.* at 76 n.25. The district court gave DCPS the benefit of any capacity it might potentially have mustered when it faulted Z.B.'s parents for not having broadly established that "removing Z.B. from DCPS is necessary" to provide her with an IDEA-compliant education. *Id.* at 77. Establishing that DCPS did not provide Z.B. an appropriate education does not require, as the district court demanded, "persuasive evidence that placing Z.B. in DCPS was *not* a viable option." *Id.* at 76.

No parent can be expected to rule out the ability of an entire school system to serve their child. Parents are only promised the support articulated in the IEP. *See R.E.*, 694 F.3d at 185-87. The focus of a parent's IDEA claim and the courts' review is the IEP, not the school system's overall capacities. The IDEA does not permit us to sustain an inadequate IEP because the school system theoretically might bolster it. *Cf. Leggett*, 793 F.3d at 68-70. Under the IDEA, plaintiffs need only prove the shortcomings of the IEP the school in fact offered.

\* \* \*

Because the district court accepted DCPS's reactive mode, and applied the wrong burden in requiring plaintiffs to show that DCPS could not provide adequate services, we cannot credit its determination that the 2014 IEP was adequate. We remand to the district court to consider in the first instance whether DCPS satisfied its obligation to assess Z.B. and offer her a tailored IEP in June 2014. We do not here resolve the

specific challenges to the IEP. Deciding whether DCPS was on notice that Z.B. needed additional support or evaluation beyond what the IEP proposed requires a "fact-intensive" inquiry. *See Endrew F.*, 137 S. Ct. at 999. The parties present conflicting accounts of the severity of Z.B.'s learning challenges as of June 2014, and of what DCPS knew or should have known and done in the circumstances.

Should the parties seek to supplement the existing record, the district court has authority under the IDEA to "hear [that] evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(c)(ii); 202 F. Supp. 3d at 74 & n.21. Z.B. might point to or introduce evidence of any aspect of her disability or need for additional services that she contends DCPS should have known at the time but failed to take into account in the 2014 IEP. For its part, DCPS might factually dispute whether it knew or should have known of any need of Z.B.'s for additional evaluations beyond what it considered in developing the 2014 IEP.

B.

Appellants also challenge the substantive adequacy of the 2015 IEP on the grounds that it lacked executive functioning goals for Z.B. and failed to provide appropriate types and hours of instruction. The record reflects that, in contrast to its approach to the 2014 IEP, DCPS took an affirmative role in collecting information to prepare for the 2015 IEP. DCPS staff conducted a functional behavioral assessment and an occupational therapy evaluation to measure Z.B.'s needs and calibrate a tailored learning plan. Taking account of Z.B.'s parents' suggestions, the evaluations the parents provided, those the Lab School provided, and DCPS's own assessments of Z.B.'s skills and needs, DCPS created a final IEP that provided eight combined hours per week of out-of-class math

and writing assistance, one hour per week of out-of-class reading assistance, behavioral support services, occupational therapy services, and various other learning aids. In view of Z.B.'s needs, as reflected in the body of assessments and highlighted by specific requests, we hold that the 2015 IEP offered Z.B. an appropriate education.

The district court correctly concluded that the 2015 IEP did not deny Z.B. an appropriate education for want of an executive functioning goal, because DCPS addressed executive functioning skills within the IEP's treatment of other areas of concern. DCPS staff testified that they typically treat executive functioning as a crosscutting factor, rather than in a separate section of the IEP. They do so because executive functioning challenges present themselves distinctly in connection with different areas the IEP addresses. Thus, the 2015 IEP set various organizational goals for Z.B. and provided services designed to enable her to achieve them. It described, for example, coaching Z.B. to use techniques such as highlighting, underlining, story-mapping, and self-questioning to help her organize her work. The IEP afforded Z.B. extra time to implement those organizational strategies in class. Appellants therefore have not demonstrated any respect in which the IEP's treatment of executive functioning goals denied Z.B. an appropriate education.

Appellants also have not shown that the 2015 IEP lacked appropriate types or hours of instruction. They contend, essentially, that the 2015 IEP—which provided for, among other things, nine hours of special education outside the general classroom setting per week—did not provide Z.B. enough small-group or individual education, especially by contrast to the full-time special education offered at the Lab School.

Without more, that argument runs up against the IDEA's imperative that, to "the maximum extent appropriate," public schools provide students with disabilities an education in the "least restrictive environment" possible. 20 U.S.C. § 1412(a)(5)(A). Ordinarily, states must ensure "removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id*. The Supreme Court recently affirmed that "the IDEA requires that children with disabilities receive education in the regular classroom 'whenever possible.'" *Endrew F*., 137 S. Ct. at 999 (quoting *Rowley*, 458 U.S. at 202).

Nothing in the record calls into question the reasonableness of DCPS's conclusion that Z.B. would benefit developmentally from interaction with her non-disabled peers. Appellants made no showing that further special education services apart from the general student population were required for Z.B.'s educational needs to be met. We thus cannot fault DCPS for its decision, consistent with the least-restrictive-environment mandate, to offer Z.B. substantial portions of her instruction in general education classrooms rather than in disability-specific groups.

Appellants advance no argument or evidence claiming any shortfall other than those two: inadequate attention to executive functioning, and failure to provide for full-time special education at the Lab School. We accordingly affirm the decision of the district court that the 2015 IEP meets the requirements of the IDEA.

III.

The IDEA calls on public schools throughout the United States to provide a free, appropriate education. Congress has not committed to educational perfection: "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 137 S. Ct. at 999 (emphasis in original). If there is a gap between the best education that money can buy at a private school for a student with disabilities and the free and appropriate education at a public school that the IDEA promises, one might justly hope to close that gap for all students. Meanwhile, what Congress has required is that public schools be "ambitious" for every child, giving each the opportunity to "meet challenging objectives." *Id.* at 1000. Disabilities can be subtle and complex. They may require expertise to identify accurately. The IDEA requires public schools to be alert to the needs of all students they serve. They must take steps to identify those students with disabilities and, armed with all reasonably available information and expertise, ensure that each IDEA-eligible student receives an education appropriate to her needs.

We affirm the district court's holding that DCPS complied with the IDEA in offering Z.B. the 2015 IEP, and remand for a determination as to whether it did so when it offered her the 2014 IEP.

*So ordered.*